THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLENE KOLODY          )
                         )
          Plaintiff,     )
                         )
     v.                  )
                         )     No. 09 C 2249
MICHAEL J. ASTRUE, Commissioner of )
Social Security,         )     Magistrate Judge Keys
                         )
          Defendant.     )

## MEMORANDUM OPINION AND ORDER

The Plaintiff Charlene Kolody moves this Court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse the final decision of the Commissioner of the Social Security Administration (Commissioner), who denied, in part, her claim for disability insurance benefits (DIB). *See* 42 U.S.C. § 401 *et seq.* (West 2008). In the alternative, the Plaintiff seeks an order remanding the case to the Commissioner for additional proceedings. For the reasons set forth below, the Court grants the Plaintiff's motion for summary judgment and remands this case to the Commissioner for additional proceedings.

## PROCEDURAL HISTORY

The Plaintiff Charlene Kolody first filed an application for DIB with the Social Security Administration on May 21, 2003. R. at 170. The Plaintiff's alleged disability arose from depression, anxiety, nerve disorder in her right leg and foot, sciatic nerve damage, and severe spasms in her right leg. R. at 261. The

Plaintiff's original alleged onset date was May 25, 2002, but the alleged onset date was later amended to May 1, 2003.[1] R. at 270, 1267.

After the claim was initially denied, the Plaintiff filed her Reconsideration Disability Report on August 20, 2003. R. at 293-96. At this time, the Plaintiff reported she suffered from depression, "severe" chronic spasms in her right leg and foot, and paralyzed right toes. *Id.* at 293. The Plaintiff also reported that she could not sit in a bathtub because she could not use her legs to get back up, and that she had trouble using stairs without hand railings. R. at 295. The Plaintiff noted that she could not perform normal daily activities due to severe depression. *Id.*

A state agency consultant subsequently reviewed the Plaintiff's past medical history. R. at 209. The consultant did not have information relating to the Plaintiff's then-most recent hospital visit for possible overdose on Xanax, but previous medical records were reviewed. R. at 212. The consultant opined that the Plaintiff had some restrictions in her ability to function due to her depression, foot and leg problems, but that she was able to do unskilled work. *Id.* The report noted that the Plaintiff could not perform any of her past jobs, but that she

---

[1] The Plaintiff repeatedly notes that the alleged onset date was amended to March 1, 2003, but the Administrative Record appears to only support an amended onset date of May 1, 2003. Compare Plaintiff's Memorandum in Support of Her Motion for Summary Judgement [sic] at 1, 2, 15 [ECF No. 31] with Administrative Record at 1267 [ECF No. 23-10].

was able to do other jobs which were "less demanding." *Id.* The Plaintiff's request for reconsideration was, consequently, denied on August 20, 2003. R. at 293.

The Plaintiff then requested a hearing before an Administrative Law Judge (ALJ); she appeared and testified on February 17, 2005 before ALJ Paul R. Armstrong. R. at 170, 177. The ALJ denied the claim for benefits by written opinion issued on April 19, 2005. R. at 167. After a timely appeal by the Plaintiff, the Appeals Council remanded the case to the ALJ for further evaluation of the Plaintiff's subjective complaints and evidence from the record. R. at 182-83. The Appeals Council held the ALJ did not adequately address the credibility factors outlined in 20 CFR 404.1529 and Social Security Ruling 96-7p. R. at 182.

On April 12, 2006, the Plaintiff appeared and testified before ALJ Denise McDuffie-Martin. R. at 19, 28. ALJ McDuffie-Martin issued an unfavorable decision on October 26, 2006 denying the Plaintiff's claim for benefits. R. at 16. On April 27, 2007, the Appeals Council denied the Plaintiff's timely request for review and upheld the denial of benefits. R. at 8. The Plaintiff then filed an appeal with the U.S. District Court for the Northern District of Illinois. R. at 615. On April 29, 2008, pursuant to a stipulation of the parties, this Court remanded the

claim to an ALJ to hold a supplemental hearing and reevaluate the Plaintiff's residual functional capacity (RFC). R. at 616A.

In the interim, the Plaintiff filed a claim for supplemental security income (SSI) on June 13, 2007 and a subsequent claim for DIB on July 10, 2007. R. at 585. The Appeals Council consolidated these claims with the previous claim filed on May 21, 2003, and instructed the ALJ to address all three. *Id.* On November 18, 2008 ALJ McDuffie-Martin presided over another hearing where the Plaintiff appeared and testified. *Id.* ALJ McDuffie-Martin issued an opinion on February 10, 2009, which was partially favorable to the Plaintiff, finding the Plaintiff disabled beginning October 1, 2004, through the date of the decision, but not from May 1, 2003 through September 30, 2004. R. at 580, 595. The Plaintiff then appealed this decision, and the matter is now before the Court.

## STATEMENT OF FACTS

### A. Plaintiff's Background

The Plaintiff was forty-five years old when she filed her claim, and she had completed one year of college by that time. R. at 292. The Plaintiff's work experience includes employment as a restaurant manager, bartender, real estate bidder and inside sales person.[2] R. at 281-88. The Plaintiff has not engaged in

---

[2] The Plaintiff had various jobs from 1984 to 2002, where she acquired sufficient quarters of coverage to remain insured through March 31, 2006. R. at 19, 262. Therefore, the Plaintiff must establish disability on or before March 31, 2006 to be entitled to DIB. R. at 19.

substantial gainful activity (SGA) since at least May 1, 2003.[3]
R. at 304.

## B. Plaintiff's Medical History

The Plaintiff's medical history begins with a visit to the
emergency room on July 28, 2001 for lower back pain radiating to
her right leg, which began after she moved some heavy boxes. R.
at 323-24. Though the pain lasted for two weeks, it had increased
in intensity on the day of her hospital visit. *Id.* The Plaintiff
was diagnosed with back strain and scoliosis, prescribed Vicodin
and Flexeril for the pain, and discharged in stable condition. R.
at 324, 328-29. On March 23, 2003, the Plaintiff went to the
emergency room for pain in her right leg and foot pain that began
seventeen days prior. R. at 311. At the time, the Plaintiff noted
that she had a history of sciatica. *Id.* An X-Ray of her right
foot was performed, and the results were "unremarkable" without
visible fracture or dislocation. R. at 313. The Plaintiff also
complained of mood swings and requested to speak to a social
worker about difficulties at home. R. at 311. The Plaintiff
denied suicidal or homicidal ideations, but explained that she
was under a lot of stress. *Id.* The hospital discharged the
Plaintiff the same day with a diagnosis of a sprained foot and

---

[3] Representations of the Plaintiff's last employment date vary throughout the
record. For example, on the Plaintiff's initial application, she indicated
that she was last employed by a pizza restaurant through April 2002. R. at
262. Later testimony and subsequent filings, however, note that the Plaintiff
worked at a pizza restaurant through April 2003. R. at 304, 499. Regardless of
when the Plaintiff was last employed, it is clear that she has had no gainful
employment since the alleged onset date of May 1, 2003.

general anxiety reaction, and the doctor prescribed Xanax as needed for the anxiety. *Id*. The emergency room physician advised the Plaintiff to schedule a follow-up appointment with an orthopedist and a psychiatrist. R. at 312.

The Plaintiff began seeing a psychiatrist on March 31, 2003. R. at 347. On her intake form, the Plaintiff noted that she had back and foot pain and suffered from depression and anxiety attacks. *Id*. At a subsequent visit on April 28, 2003, the treating physician noted that the Plaintiff had extreme functional limitations in daily living activities, social functioning and concentration. R. at 342. The doctor opined that it was too soon to assess the Plaintiff's response to treatment, but the Plaintiff reported some improvement due to the medication. R. at 342. The doctor prescribed Zoloft and Klonopin, after diagnosing her with major depression. R. at 341-42. The Plaintiff continued to see the psychiatrist, with weekly visits through May 7, 2003. R. at 316. Throughout the time of these weekly visits, the Plaintiff lived with a family and watched the family's children during the day. *Id*. The Plaintiff explained that pain and immobility limited her daily activities. *Id*. She also explained that she had a family history of depression and did "want to get better." R. at 316-17. The Plaintiff was oriented in time and could speak coherently, but her speech was often anxious, with a depressed theme. R. at 317.

On June 18, 2003, a social worker concluded that the Plaintiff suffered from phase of life, with depression, and ordered that she continue individual counseling and medication. R. at 318. The social worker noted that, given the Plaintiff's physical and mental condition, she might be able to be employed as a babysitter. *Id*. The social worker also noted that the Plaintiff did well in relationships with friends and family, but that stress from jobs was too much. R. at 317.

Between June 23, 2003 and August 25, 2003, the Plaintiff attended multiple appointments with Dr. Boddapati, a psychiatrist with Catholic Charities. R. at 336-39. The Plaintiff received free medication during these visits, and the prescriptions of Xanax and Klonopin were continued. *Id*.

On July 11, 2003, the Plaintiff was admitted to the Provena St. Joseph Medical Center emergency room for acute pancreatitis secondary to alcohol binging. R. at 429. The Plaintiff was taking Zoloft and Xanax at that time, and she reported that her past medical history included anxiety and depression. *Id*. While at the hospital, the Plaintiff's psychiatrist performed an evaluation and suggested that she continue taking Zoloft and Xanax. R. at 430. The hospital discharged the Plaintiff on July 15, 2003 in stable condition. *Id*.

On October 2, 2003, the Plaintiff was admitted to Silver Cross Hospital for possible overdose of Xanax. R. at 438. The

Plaintiff denied remembering that she contemplated suicide or took any pills, but she admitted feeling increasingly depressed. *Id.* The Plaintiff admitted having more stressors at the time due to her "chaotic" living situation. *Id.* The Plaintiff remained on the psychiatric floor until October 6, 2003 after her one-day stay in the intensive care unit. *Id.* The Plaintiff continued to deny suicidal ideations, and her depression improved with medication. *Id.* At the time of discharge, the Plaintiff's condition had improved, and she agreed to live with a different friend to avoid the added stress. *Id.*

From November 10, 2003 to December 8, 2003, the Plaintiff was treated at Tinley Park Mental Health Center; she was admitted on certificate from St. Joseph's Hospital due to depression, anxiety and suicidal ideation. R. at 366. The Plaintiff reported having a cycle of depression and anxiety. R. at 379. She said she did not think of killing herself, but her stress overwhelmed her and she did not "feel like living." *Id.* The Plaintiff also reported that she had previously stopped seeing her psychiatrist and therapist due to financial hardship and issues with non-compliance. R. at 381. The Plaintiff noted that she had stopped taking Zoloft three months prior due to her inability to pay for it. R. at 368-69. At the time of admission, the doctors diagnosed the Plaintiff with Bipolar II Disorder, alcohol abuse,

a history of post-traumatic lower back pain and a Global Assessment of Functioning (GAF) of 50.[4] R. at 366.

During the first two weeks of treatment, the Plaintiff's mood stabilized, and she started to engage her peers and others. R. at 367. The Plaintiff's lower back pain was soon relieved after taking Ibuprofen. *Id.* The hospital gave the Plaintiff medication at this time, noting she responded very well to medication. *Id.*

During this hospitalization, the treating physician noted the Plaintiff's history of right sciatic nerve leg pain. R. at 368. A physical examination showed no back swelling or tenderness, and the doctor instructed the Plaintiff on how to properly lift items and protect her back. R. at 401-02. The Plaintiff's GAF dropped as low as 25 during this period.[5] R. at 369. The hospital made an aftercare appointment for the Plaintiff with a Will County Medical Health Center physician on December 9, 2003, noting that outpatient services were "imperative." R. at 367, 384. The Plaintiff's condition continued to improve due to medication, and she was able to carry out three-step instructions, concentrate on tasks, evaluate choices and make

_____

[4] The GAF is a numeric scale (0-100) used to subjectively rate the functioning of adults. Higher scores represent higher levels of functioning. Scores of 41-50 represent "serious symptoms," including suicidal ideation and serious social impairment. Scores of 51-60 represent "moderate symptoms," including flat affect and moderate difficulty in social situations. DSM-IV-TR 34 (American Psychiatric Association) 4th ed. 2000.

[5] GAF of 21-30 represents serious impairment in communication and/or judgment. *Id.*

decisions. R. at 397. The Plaintiff was discharged on December 8, 2003 with a diagnosis of Bipolar II Disorder in remission, relieved lower back pain, and a GAF of 85.[6] R. at 367. On discharge, the Plaintiff agreed to continue to take Lithium Carbonate and Seroquel. *Id.*

After the Plaintiff had multiple sessions with psychiatrists throughout December 2003 and January 2004, a doctor with the Will County Health Department performed a psychiatric evaluation on January 22, 2004. R. at 414, 422-23. The Plaintiff denied suicidal thoughts, but she admitted to having anxiety attacks. R. at 414A. The Plaintiff had "good" insight and knowledge, and "adequate" attention and concentration. *Id.* The doctor diagnosed the Plaintiff with right leg sciatica, foot numbness and muscle spasms, Bipolar II Disorder and a GAF of 60. *Id.* The Plaintiff indicated that she wanted to continue her medication and the doctor continued the prescription of Lithium Carbonate and Seroquel. *Id.* At that time, the Plaintiff lived with her boyfriend, and received sample medication from the Will County Health Department. R. at 414.

The Plaintiff attended monthly counseling appointments with Dr. Jan Stampley at the Will County Health Department in Joliet through much of 2004. R. at 418, 441-53. Dr. Stampley continued giving the Plaintiff sample medication. On March 18, 2004, the

---

[6] GAF of 81-90 is "absent or minimal symptoms" with good functioning in all areas. *Id.*

Plaintiff reported that she felt and functioned well. R. at 418. The doctor reported global functioning as stable, attitude as cooperative and friendly, mood as normal, attention as focused and no side effects. *Id.* Dr. Stampley continued the prescription of Lithium Carbonate and Seroquel. *Id.* At the Plaintiff's April 14, 2004 appointment, the doctor noted that her symptoms appeared to be under control with medication, and that her global functioning was stable. R. at 415. On subsequent appointments, the Plaintiff complained of problems with her living situation, but Dr. Stampley noted that her global functioning was fairly stable on May 13, 2004. R. at 442. Due to thyroid issues, Dr. Stampley switched the Plaintiff's medication from Lithium Carbonate to Trileptal. *Id.*

On June 3, 2004, the Plaintiff's condition remained stable, according to Dr. Stampley, though she continued to complain of housing problems. R. at 444. The Plaintiff told Dr. Stampley that she felt "good" but thought that she was too stressed to work. *Id.* Dr. Stampley noted the Plaintiff felt better while taking Trileptal, as compared to Lithium Carbonate, so the doctor continued this prescription, along with Seroquel. *Id.* By July 18, 2004, the Plaintiff had moved in with a new boyfriend. R. at 446. The August 15, 2004 assessment by Dr. Stampley reported continued progress, and the prescriptions for Trileptal and Seroquel were reordered. R. at 448.

By the end of August 2004, the Plaintiff would call Dr. Stampley increasingly to complain of anxiety attacks. R. at 449. The Plaintiff reported that she could often not leave her room because of the anxiety. *Id.* After the Plaintiff asked for medication to help with her anxiety, the doctor recommended that she contact a therapist, and the Plaintiff agreed. *Id.* Later, Dr. Stampley discussed the Plaintiff's lifestyle with her, explaining that the relationships she maintained could be problematic. R. at 451. On September 2, 2004, the Plaintiff called Dr. Stampley to complain about increased depression and loss of sleep. R. at 452.

On September 19, 2004, the Plaintiff went to the emergency room, complaining of increased depression and anxiety attacks over the past several weeks. R. at 426. After the initial assessment, the hospital discharged the Plaintiff from the emergency room, because she did not require psychiatric admission. *Id.* After leaving, however, the Plaintiff came back with scratches on her wrist from a self-inflicted injury, and she said that she became increasingly depressed and "would probably" become suicidal if she was not admitted to the hospital. *Id.* After being admitted into the emergency room, the Plaintiff reported that her psychiatric illness began approximately in May 2002. *Id.* The Plaintiff denied having any hallucinations and noted that she was "not actually suicidal" but felt that she had to injure herself to gain admittance to the hospital. *Id.* The

12

Plaintiff said that her recent stressors included her boyfriend leaving town, thereby leaving her homeless. *Id.*

According to Dr. Stampley, who evaluated the Plaintiff at the hospital, the Plaintiff continued to decompensate during her previous less intensive outpatient setting. R. at 427. The mental examination performed by the doctor showed broad affect, focused attention, somewhat impaired concentration and no evidence of imminent suicidal ideations, plan or intent. *Id.* The Plaintiff's focus was centered on finding adequate housing. *Id.* The Plaintiff was discharged on September 24, 2004 with a diagnosis of major depressive disorder and a GAF of 55. R. at 427-28.

On October 22, 2004, the Plaintiff's treating physician diagnosed her with herniated lumbar disc with right-sided sciatica. R. at 437. At that time, the Plaintiff voluntarily lived in a nursing home, and she complained of low back pain causing pinching in her right leg. *Id.* She also told the doctor that her toes were numb and paralyzed, and her back pain caused both knees to buckle. *Id.* An MRI in 2005 and an EMG in 2007 showed degenerative changes in the lumbar spine and disc protrusion, and chronic right demyelinating peroneal neuropathy and degeneration. R. at 1002, 1110.

The Plaintiff's subsequent medical records consist of similar complaints and diagnoses relating to Bipolar Disorder,

anxiety, depression, degenerative disc disease, right-sided sciatica and right toe numbness.[6] R. at 594-95.

## C. Claimant, Non-treating Physician, and Staff Reports

On May 21, 2003, after submitting her initial application for disability benefits, the Plaintiff was interviewed in the Social Security Field Office. R. at 271. The interviewer noted that the Plaintiff had no difficulty talking, concentrating, sitting, standing or walking. *Id.* The interviewer also noted that the Plaintiff's hygiene habits and appearance were average. *Id.*

On June 10, 2003, the Plaintiff submitted an Activities of Daily Living Questionnaire which was required for her claim of physical impairment. R. at 274. The Plaintiff reported that she had trouble carrying items up stairs and that her feet were unstable. *Id.* She noted that she could drive for up to forty-five minutes, and she walked with a limp. R. at 275. She reported that she could sit for long periods of time if "kept busy with conversation, etc." R. at 275. The Plaintiff also noted that she did not feel afraid of people, occasionally watched children and talked to neighbors, and could be left home alone. R. at 278-79. The Plaintiff made her own meals, including sandwiches and pot roasts, and she usually went shopping and did laundry once per week. R. at 276-77.

---

[6] Subsequent medical history is not relevant to this opinion because both the Plaintiff and the Defendant agree that the Plaintiff was disabled as of October 1, 2004.

The Plaintiff reported that many of her daily activities were negatively impacted by her depression. R. at 276. The Plaintiff noted that she was "bed ridden" for as long as three days at a time due to depression. *Id.* The Plaintiff also reported constant leg pain that would get worse on some days, but she could complete most tasks at her own pace on "good day[s]." *Id.* The Plaintiff reported that she could only baby-sit on good days, as well. *Id.*

On June 24, 2003, a state agency medical consultant reviewed the Plaintiff's medical history and completed an RFC assessment. R. at 362-64. The doctor noted that the Plaintiff experienced combined affective and anxiety disorders and took anti-depressant and anti-anxiety medications. R. at 364. The doctor also noted that the Plaintiff cared for children, shopped, cleaned and did laundry, and there was no indication of problems with orientation, thought or memory. *Id.* At that time, the Plaintiff could perform simple tasks. *Id.* While social skills were impaired, the Plaintiff could retain friendships and handle reduced interpersonal contact. *Id.* The Plaintiff could perform routine, repetitive tasks, as indicated by her ability to follow instructions and travel independently. *Id.*

The Plaintiff appeared and testified at three separate hearings. R. at 465, 518, 1240. The first hearing occurred on February 17, 2005, and ALJ Paul Armstrong and the Plaintiff's

prior counsel, Robert Kielian, questioned the Plaintiff about her claim for DIB. R. at 518-56. The Plaintiff noted that she was employed for several years, but her condition caused concentration problems and tiredness. R. at 524. The Plaintiff explained that she had no health insurance, and that she had foot nerve damage and a paralyzed right foot, which prevented her from walking on uneven ground. R. at 529, 539. The Plaintiff answered a few questions about her previous work experience and testified that she would not be able to work in her previous jobs anymore. R. at 532-33.

The Plaintiff's "chronic pain" took a lot out of her, and her neck and back often hurt. R. at 536. When asked about other physical problems, the Plaintiff responded that her right leg hurt and made her unable to walk up hills. R. at 537-38. The Plaintiff explained that the sciatic nerve goes from her back to her legs, which is why her back and leg pain is related. R. at 538. She testified that she could not stand for a long time, as that hurt her back. R. at 540.

The Plaintiff also explained that she has had trouble with anger management and violent outbursts, in addition to other mental health issues. R. at 535, 540. The Plaintiff was seeing a therapist and psychiatrist through Catholic Charities, but this provider later rejected her after she overdosed on her medication. R. at 541-42. After this, the Plaintiff moved into

16

someone's basement, and she would baby-sit the owner's child. R. at 542. The Plaintiff explained that, after about two weeks of this, the owner started putting more responsibility on her and she began having panic attacks. R. at 543-44. The Plaintiff then moved out of this house. R. at 544. At the time of the hearing, the Plaintiff was seeing a psychiatrist about once every month. R. at 545.

The Plaintiff's second hearing occurred on April 12, 2006, and the Plaintiff appeared and testified before ALJ McDuffie-Martin. R. at 465. The Plaintiff began by answering questions about her mental health history. R. at 473. She explained that she was unaware at first that she had any problems, but that a counselor told her she needed help. *Id.* She began taking Xanax in order to stabilize her condition, so that she could then see a psychiatrist. *Id.* The Plaintiff then confirmed that she was eventually rejected by Catholic Charities because of her suicide attempt. R. at 474.

The Plaintiff then explained the circumstances leading up to her admission to Silver Cross, where she was treated for an overdose. R. at 474-75. She noted that, at the time of the incident, she was in denial about her suicide attempt. R. at 475. The Plaintiff noted that she then tried to take a job as a live-in baby-sitter, but it only lasted a few days because she had a nervous breakdown. *Id.* She reported that the responsibility that

was put on her caused overwhelming anxiety. *Id.* When asked about her medications and their side effects, the Plaintiff stated that the medications usually cause her to sleep during the day. R. at 477.

Next, the Plaintiff answered questions about her admission to St. Joseph's medical center in September 2004. R. at 480. The Plaintiff noted that she was initially denied admission because she was not suicidal, so she went out and "cut" her wrists.[7] *Id.* The Plaintiff reported that she felt suicidal and that her personality "was kind of out of control." R. at 481. She felt depressed and anxious. *Id.*

Later, the Plaintiff responded to a question about the treatment she received for her back and toe pain. R. at 493. The Plaintiff noted that she consistently had problems with pain, but she was unable to afford the medication. R. at 493. She thought it was useless to seek treatment when she could not afford the medication. *Id.* The pain made her unable to walk on uneven ground, and her back would sometimes hurt from doing the dishes. R. at 494. The Plaintiff noted that she was able to walk, but that her back would hurt if she had to stand "off and on" for about six hours. *Id.*

The third hearing occurred On November 18, 2008, and the Plaintiff again appeared and testified before ALJ McDuffie-

---

[7]   The Plaintiff testified that she "cut" her wrists, but the medical documents report that she had "scratches" on her wrists. *See* R. at 426.

18

Martin. R. at 1242. The Plaintiff testified that her depression was the primary reason she could no longer work when she filed for disability benefits in 2003. R. at 1248. She said the depression often made her feel "like death [was] the only answer to not feeling bad." *Id.* The Plaintiff also explained that she had problems with anxiety, which caused her "to feel out of control." R. at 1252.

When asked about the pain she experienced, the Plaintiff note that problems with her ankle go back to at least 2005. R. at 1253. She testified that her toes had been paralyzed for as long as she could remember.[8] R. at 1254.

## E. Medical Expert's Testimony

During the final hearing before ALJ McDuffie-Martin on November 18, 2008, medical expert (ME) Walter Miller, M.D. appeared and testified about this claim. R. at 1242. After the ME noted that the Plaintiff's degenerative disc disease met the severity requirements of Listing 1.04A, the ALJ asked about the onset date of this injury. R. 1264-65. The ME explained that the date of the EMG which showed the Listing was met was given in December 2007. R. at 1265. The doctor then noted that the Plaintiff complained of symptoms related to degenerative disc disease as early as May 2003, meaning her alleged onset date was

---

[8] Subsequent testimony by the Plaintiff focused on pain, depression, anxiety, and functional capacity assessment at the time of the hearing, which was four years after the time period in dispute for this case. R. at 1247-63 Therefore, this subsequent testimony is not addressed here.

accurate if her statements could be credited. R. at 1268. The ME noted that during a 2005 appointment with a treating physician, the Plaintiff reported experiencing, for the past two years, the same pain she exhibited at that time; this pain was consistent with degenerative disc disease. R. at 999. But, in response to a question by the ALJ, the ME noted that objective evidence sufficient to meet the severity requirements only goes back as far as October 2004, when the Plaintiff was diagnosed with a herniated lumbar disc.[9] R at. 1266-69.

## F. Vocational Expert's Testimony

Mr. Edward Pagella, a vocational expert (VE), appeared and testified at the Plaintiff's final hearing. R. at 1240, 1270. The VE explained that the Plaintiff's previous work history included jobs which were semiskilled and low semiskilled with light level of physical tolerance. R. at 1270. The expert testified that a hypothetical individual of the Plaintiff's age, education and work experience, limited to light work; occasional overhead reaching bilaterally; no climbing of ladders; occasional climbing of ramps and stairs, with occasional balancing, stooping, kneeling, crouching and crawling; unskilled, simple, routine and repetitive jobs; and minimal contact with others could not do any of the Plaintiff's past work. R. at 1270-71. The expert

---

[9] During this testimony, the Plaintiff noted that she would have obtained objective evidence of the injury prior to October 2004 if she did not have difficulties receiving health care. R. at 1266.

testified, however, that there were multiple positions that could accommodate the limitations mentioned previously, including hand packers (3,800 positions), hand sorters (1,800 positions) and hand assemblers (4,200 positions). R. at 1271. The VE explained that these three types of jobs would allow the individual to do simple, repetitive tasks without any communication with others, provided she completed the work-related tasks. *Id.*

The VE then testified that, if the individual instead was not limited to only minimal contact with supervisors, coworkers and the public, but had the added limitation of no tight time deadlines or high production quotas, such an individual could work as a file clerk (7,200 positions), a hostess (8,400 positions), or an usher (1,200 positions). R. at 1272. The VE understood that such an individual would have to be able to complete three to four steps of instructions. *Id.* The expert noted that, if the individual required both minimal interaction with others and no tight time deadlines, no jobs would be available. R. at 1273.

For all jobs mentioned by the VE, he noted that the individual would only be able to miss work one and three-quarter days per month. *Id.* This amounts to twenty-two days in the course of a year, meaning that, if the individual missed one month's worth of work, she would likely be terminated from employment. *Id.* The VE also testified that, if the individual had to take

three, twenty-minute unscheduled breaks per day, which were not necessarily during the person's set lunch break, the individual would likely be terminated if this persisted past a week or two. R. at 1274.

## DISCUSSION

### A. The ALJ's Decision

The ALJ issued her opinion on February 10, 2009, holding that the Plaintiff's degenerative disc disease met the requirements of section 1.04A beginning October 1, 2004, but that the Plaintiff was not disabled prior to that date. R. at 589, 594, 596. The ALJ held that, from the alleged onset date of May 1, 2003 to September 30, 2004, the Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). R. at 589, 594. The ALJ applied the five-step sequential evaluation process to determine whether the Plaintiff was disabled. R. at 586.

At step one, the ALJ evaluated whether the Plaintiff had engaged in SGA since her alleged onset date, and she found that the Plaintiff had not engaged in such activity. R. at 586, 588. At step two, the ALJ determined that the Plaintiff's impairments or combination of impairments were "severe" enough to meet the regulations. R. at 588. The ALJ noted that the following impairments met the requisite severity: right foot drop, discogenic and degenerative disorders of the spine, obesity,

bipolar disorder, depression, anxiety and substance abuse disorder. *Id.*

At steps three, four and five, the ALJ divided her analysis into two separate time periods – from May 1, 2003 to September 30, 2004, and from October 1, 2004 to the time of the decision. R. at 588-95. At step three, the ALJ found that the Plaintiff did not have an impairment, or combination of impairments, prior to October 1, 2004 that met the criteria in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)). R. at 588. She found that the Plaintiff's physical impairments failed to meet Listing 1.04. R. at 589. The ALJ also found that the Plaintiff's mental impairments never met the criteria of listings 12.04 and 12.06. *Id.*

Before discussing steps four and five, the ALJ explained at length her analysis of the Plaintiff's RFC prior to October 1, 2004. *Id.* The ALJ found that the Plaintiff could perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), meaning that she could not work on uneven surfaces, ladders, ropes or scaffolds, but could occasionally balance, stoop, kneel, crawl, crouch and climb ramps and stairs. *Id.* Here, the ALJ found that the Plaintiff's "impairments could reasonably be expected to produce the alleged symptoms," but she found the Plaintiff's statements about the effects of those symptoms prior to October 1, 2004 not credible. R. at 590. With respect to the Plaintiff's

physical impairments, the ALJ found no evidence during this period that showed that the Plaintiff could not perform light work. R. at 591. The ALJ concluded her discussion of the Plaintiff's physical RFC assessment by noting the limited objective medical evidence in the record relating to the Plaintiff's degenerative disc disease and foot problems prior to October 2004. R. at 592.

The ALJ also found that the Plaintiff had the mental RFC to perform simple, unskilled, repetitive and routine work tasks in a low stress work environment, with minimal interaction with others. R. at 589-90. With regard to the Plaintiff's mental impairments, the ALJ noted many of the Plaintiff's appointments with psychiatrists and social workers. R. at 591. This included a diagnosis of a GAF of 50 in December 2003, which the ALJ explained indicates "serious symptoms or any serious impairment in social, occupational, or school functioning." *Id.* The ALJ gave considerable weight to opinions provided by state agency medical consultants who, in both 2003 and 2007, found that the Plaintiff could perform "simple, routine, repetitive tasks in settings with reduced interpersonal contact." R. at 592. The state agency consultants arrived at their conclusions after reviewing the Plaintiff's report of daily activities, which included cooking her own meals, shopping once a week and talking to neighbors. *Id.* While the ALJ noted that the Plaintiff had "a number" of mental

24

impairments and hospital visits, she highlighted that the Plaintiff responded well to treatment. *Id.* If the Plaintiff complied with her prescribed treatment regimen, her symptoms were well controlled. *Id.* The ALJ found that the Plaintiff's testimony was not fully credible at this time because the record contradicts her testimony about severity and frequency of her symptoms. R. at 593.

At step four, the ALJ found that, prior to October 1, 2004, the Plaintiff was unable to perform past relevant work. *Id.* At step five, the ALJ found that, prior to October 1, 2004, a number of jobs existed that the Plaintiff could perform. In this determination, the ALJ relied on VE testimony and the ALJ's previous finding that the Plaintiff's RFC enabled her to perform "light work." R. at 594. Here, the ALJ noted that the Plaintiff had additional limitations, but that the VE testified that such a claimant could work as a hand packer, hand sorter or hand assembler despite the limitations. *Id.* After finding that the Plaintiff could work a number of jobs that existed in the national economy, the ALJ found the Plaintiff not disabled as required by the framework of Medical-Vocational Rule 202.21. *Id.*

The ALJ then evaluated step three for the time period beginning on October 1, 2004. *Id.* The ALJ found that the severity of the Plaintiff's degenerative disc disease met the requirements of section 1.04A, based on ME testimony. *Id.* The ME testified

that the Plaintiff was diagnosed with herniated lumbar disc with right-sided sciatica, on October 22, 2004. R. at 594-95. The ME also pointed to later MRI and EMG studies showing the progression of the disease. R. at 595. The ALJ noted that she relied heavily on the opinion of the ME and gave little weight to the state agency consultants' opinions. *Id.* The ALJ gave greater weight to the ME's opinion because it was more consistent with the record as a whole. *Id.* The ALJ noted that the Plaintiff was more limited than determined by the state agency consultants who reviewed these physical impairments. *Id.*

With a disability finding beginning October 1, 2004 in step three, the ALJ was not required to proceed further. *Id.* The ALJ found the Plaintiff disabled beginning October 1, 2004, but not from May 1, 2003 to September 30, 2004. *Id.*

## B. Social Security Regulations

An individual seeking DIB must prove that she has a disability under the Social Security Administration's Regulations. *Knight v. Chater*, 55 F.3d 309, 312 (7th Cir. 1995). Social Security regulations provide a five-step inquiry to determine whether a claimant is disabled. *Id.* at 313. First, the ALJ must determine whether the claimant is currently employed. Second, the ALJ must determine whether the claimant has a severe impairment. Third, the ALJ must determine whether the claimant's impairments meet or equal one of the impairments listed by the

SSA in 20 C.F.R. § 404, Subpt. P, App. 1. Fourth, the ALJ must determine whether the claimant can perform her past work. Fifth, the ALJ must determine whether the claimant is capable of performing work in the national economy. 20 C.F.R. § 404.1520. If a claimant satisfies steps one, two and three, she will automatically be found disabled. *Knight*, 55 F.3d at 313 (7th Cir. 1995). At Steps One through Four, the claimant bears the burden of proof; at Step Five, the burden shifts to the Commissioner. *Id.*

## C. Standard of Review

The Court must determine whether the final decision of the Commissioner is both supported by substantial evidence and based on the proper legal criteria. *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). "Substantial evidence means 'more than a mere scintilla' of proof, instead requiring 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's decision, which cannot stand without evidentiary support or adequate discussion of the issues. *Lopez ex. rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). However, the Court does not "reweigh evidence, resolve conflicts, decide questions of credibility or substitute [its] own judgment for that of the Commissioner." *Id.* (citations

omitted). Where conflicting evidence allows reasonable minds to differ as to the alleged disability of the Plaintiff, the responsibility for determining whether the Plaintiff is disabled falls upon the Commissioner, not the Court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)(citations omitted).

While the ALJ need not address every piece of evidence in the record, she must articulate her analysis by building an "accurate and logical bridge from the evidence to [her] conclusion" so that the Court may afford the Plaintiff meaningful review of the Commissioner's findings. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)(citations omitted). The ALJ, and not the Commissioner's lawyers, must articulate this analysis and explain the evidence. *Steele v. Barnhart*, 290 F.3d. 936, 941 (7th Cir. 2002); *Spiva v. Astrue*, 628 F.3d. 346, 353 (7th Cir. 2010)(noting that a persuasive brief by the Commissioner's lawyers cannot substitute for missing analysis in the ALJ's opinion).

While the Court has the authority to enter judgment affirming, modifying or reversing the Commissioner with or without remanding the cause for rehearing, an award of benefits by the Court is only appropriate where all factual issues have been resolved. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005)(citing *Campbell v. Shalala*, 988 F.2d 741, 744

(7th Cir. 1993)). This result is warranted only when the "record can yield but one supportable conclusion." *Id.*

## D. ALJ's Onset Date Determination

In determining the onset date of the Plaintiff's disability, the ALJ relied heavily on testimony from the ME. R. at 594. During the November 18, 2008 hearing, the ME initially agreed that the onset date "would go back to May of '03." R. at 1267. In so finding, the ME relied on complaints from the Plaintiff during a January 2005 medical examination where she told the doctor that her right foot and toes had been numb for two years. R. at 1267. The ME also referred to the Plaintiff's March 23, 2003 hospital visit, noting her longstanding pain down the right leg "might" be related to the condition that met the Listing criteria. R. at 1268. Only after the ALJ asked for "objective evidence" did the ME conclude that the Plaintiff was not "clearly" disabled until October 2004. R. at 1268-69.

The Plaintiff argues that, in determining the Plaintiff's onset date, the ALJ made no mention of (SSR 83-20). R. at 588-95. However, if the ALJ conducted the requisite analysis, her failure to refer directly to SSR 83-20 is not reversible error. *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989) (citing *Lichter v. Bowen*, 814 F.2d 430, 435 (7th Cir. 1987)). The purpose of SSR 83-20 is to describe the relevant evidence to be considered when determining the onset date of the disability after a disability

has been found. *Lichter*, 814 F.2d at 434. For disabilities of nontraumatic origin, three factors are to be considered in determining the onset date: the Plaintiff's allegations, the Plaintiff's work history, and medical and other evidence. *Id.* The starting point for this determination is the Plaintiff's alleged onset date, which "should be used if it is consistent with all the evidence available." *Id.* (quoting SSR 83-20, at 109 (C.E.1983)). SSR 83-20 also explains that the "day the impairment caused the individual to stop work is frequently of great significance." *Id.* (quoting SSR 83-20, at 109 (C.E.1983)). Medical evidence is the "primary element" in the onset determination, but where there is no medical evidence as to the exact onset date and disabling impairments seem to have occurred prior to the date of the first recorded medical examination, the ALJ should ask the ME to make necessary inferences. *Id.* at 434-35. However, the chosen onset date can never be inconsistent with the medical evidence in the record. *Id.* at 434.

In *Lichter*, the plaintiff did not produce any medical evidence showing that he was disabled on his alleged onset date. *Id.* at 435. But the Seventh Circuit noted that, had the ALJ properly applied SSR 83-20, the lack of this objective evidence would not alone have been determinative. *Id.* If the alleged onset date was consistent with the medical and other evidence, SSR 83-20 would have "required" the ALJ to adopt the alleged onset date.

*Id.* In determining whether the alleged onset date was "not clearly inconsistent with the other available evidence," the court in *Licther* looked at the Plaintiff's testimony and whether he had engaged in SGA since that date. *Id.* at 435-36. The court also looked at medical reports that indicated, while not expressly identifying an exact date, the impairment began earlier. *Id.* at 436.

Similarly, in *Briscoe ex rel. Taylor v. Barnhart*, a case cited in support by the Plaintiff, the lack of objective medical evidence did not mean that the alleged onset date was incorrect. 425 F.3d at 353. Indeed, the court held that, when no precise onset date is available, the ALJ "must infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process and should seek the assistance of a ME to make this inference." *Id.* The ME in *Briscoe* found no objective medical evidence supporting the alleged onset date, and the ALJ drew a negative inference from this point, which violated SSR 83-30. *Id.*

In this case, the Plaintiff was similarly unable to point to clear objective evidence that her disability met the requisite listing before October 1, 2004. R. at 591. However, the Seventh Circuit, in both *Briscoe* and *Lichter*, held that this is not required of the Plaintiff. While the Defendant is correct that this case differs slightly from *Briscoe* because the Plaintiff did

have substantial medical records prior to the determined onset date, neither *Briscoe* nor *Lichter* held that previous inconclusive medical records change the analysis required by SSR 83-20. Also, just as the plaintiff in *Lichter* repeatedly challenged the ALJ's onset date determination, the Plaintiff's counsel, during the ME's testimony, repeatedly tried to point to evidence of an onset date going back to March 2003. R. at 1268. The Defendant misstates the Plaintiff's position by saying that she alleged that the listing was met only since October 2004. The Plaintiff's counsel said he could not "dispute the doctor's opinion," but it is clear from the testimony that the Plaintiff alleged an earlier onset date. R. at 1268-69.

The ALJ's October 2004 onset date determination relies heavily on the lack of medical evidence dating back to May 1, 2003. R. at 591. The ALJ notes that the Plaintiff frequently complained of back and/or foot pain throughout 2003 and 2004, but she brushed this aside because the Plaintiff's activities of daily living report suggested activities consistent with a light RFC. *Id.* But the ALJ never explained how the frequent complaints of leg and foot pain are inconsistent with a May 1, 2003 onset date. The ALJ found the Plaintiff to not be fully credible during the time prior to October 1, 2004, but SSR 83-20 requires a different analysis. *Licther*, 814 F.2d at 435. The court in *Licther* held that the alleged onset date must be "clearly

inconsistent" with the other available evidence in order for the ALJ to properly reject it. *Id.* Here, with the alleged onset date as the starting point, there appears to be no evidence inconsistent with this date. The ALJ's simple mention that the Plaintiff's RFC allowed light work is not ample explanation for not accepting the Plaintiff's alleged onset date, as SSR 83-20 requires. *Id.* Without showing that the Plaintiff's alleged onset date is inconsistent with the evidence, that date should be used. *Licther*, 814 F.2d at 434-35.

And while the ALJ discussed medical evidence during her explanation of her onset date determination, she failed to discuss the first two steps required by SSR 83-20. R. at 588-93. The ALJ should have started with the Plaintiff's alleged onset date and then explained how that was inconsistent with the record. *Licther*, 814 F.2d at 434. Instead, the ALJ reversed the process by starting with the earliest objective medical evidence and working backwards. R. at 591. The ALJ also failed to consider the Plaintiff's failure to engage in SGA since her alleged onset date. The ALJ appears to infer that the lack of such activity goes against the Plaintiff's credibility because her daily activity report hinted that she had the RFC to perform light work. But SSR 83-20 states that the date the Plaintiff stopped working is often helpful in determining the onset date. *Licther*, 814 F.2d at 434. While the record is unclear with regard to

33

exactly when the Plaintiff stopped working, the ALJ made no reference to this, nor did she seek to determine this information. Any uncertainty or inconsistency about the Plaintiff's alleged onset date requires the ALJ to obtain additional medical and nonmedical evidence, but the ALJ simply stopped her analysis with the lack of objective medical evidence. *Id.* 435.

While the Defendant claims that this is similar to the credibility determination in *Herr v. Sullivan*, this error is not a mere difference in opinion about the weight of competing evidence. This amounts to more than an "evidentiary dispute." Instead, the ALJ failed to properly evaluate the three factors as required by SSR 83-20. Failure to apply the requisite analysis is reversible error. *Pugh*, 870 F.2d 1274.

The ALJ's failure to properly determine the onset date of the Plaintiff's disability requires further review of this case. While it is possible that further evidence will reveal that the Plaintiff was in fact not disabled until October 1, 2004, the ALJ's lack of explanation and analysis, as required by SSR 83-20, demands a redetermination of the Plaintiff's disability onset date. Because factual issues still exist, this case must be remanded to the Commissioner for additional proceedings.

## E. ALJ's Credibility Determination

Because the ALJ is in the best position to determine credibility, this Court is deferential to the ALJ with regard to credibility determinations. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Credibility determinations are only overturned if they are "patently wrong." *Id.* But, the ALJ must note specific reasons for making credibility findings, with specific references to the record. *Id.*

Here, the ALJ described at length why she found the Plaintiff not fully credible in describing her symptoms prior to October 1, 2004. R. at 590-93. The ALJ noted the Plaintiff's frequent hospital visits, consistent complaints of back and foot pain, and much of the medical evidence concerning physical and mental impairments, including specific references to the record. *Id.* While the Plaintiff is correct that the Seventh Circuit has held that "boilerplate language" does not belong in ALJ credibility findings, the ALJ's decision includes much more than a simple recitation of the standard. Unlike the credibility finding in *Brindisi ex rel. Brindisi v. Barnhart*, on which the Plaintiff heavily relies in her briefs, the ALJ evaluated the Plaintff's credibility for almost three pages. R. at 590-93. The ALJ did not rely on a "conclusory determination" similar to that of the ALJ in *Brindisi*.

The Plaintiff also misrepresents how the ALJ discussed credibility in relation to the Plaintiff's RFC. Unlike the cases cited by the Plaintiff, the ALJ did not compare the Plaintiff's testimony to an already determined RFC. Instead, the ALJ pointed to a number of conflicting pieces of evidence, including reports by state agency consultants and the Plaintiff's activities of daily living reports. R. at 591. While the Plaintiff is correct that the ALJ did not comment on every piece of evidence from the record, this is not required of the ALJ. *Briscoe*, 425 F.3d at 354.

Further, the Plaintiff claims that the ALJ incorrectly drew a negative inference from the Plaintiff's failure to seek further treatment for her back and leg problems prior to October 2004. Plaintiff's Memorandum in Support of Her Motion for Summary Judgement [sic] at 11 [ECF No. 31]. While the ALJ noted that there was little evidence supporting the Plaintiff's alleged onset date, the ALJ does not appear to have drawn a negative inference from the lack of hospital visits, as the Plaintiff alleges. R. at 591. It is true that an ALJ cannot draw negative inferences from a Plaintiff's failure to seek treatment without exploring it further, but the ALJ drew no such inferences. *Craft*, 539 at 679. Unlike *Craft* where the ALJ expressly stated that the claimant was not credible because he did not seek treatment, the ALJ in this case contrasted the lack of medical evidence

supporting the Plaintiff's claim with the Plaintiff's activities of daily living reports. R. at 591. As the Defendant correctly states, the Plaintiff's reported daily activities are relevant to credibility findings. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)(using the plaintiff's report of daily activities to evaluate credibility).

The same is true for the ALJ's determination of credibility relating to the Plaintiff's alleged mental impairments. The ALJ noted much of the Plaintiff's mental health history in her decision, and she properly looked to the opinions of the state agency consultants in addition to other medical evidence. While the ALJ cannot use contradictory opinions of non-examining physicians unless they are supported by substantial evidence in the record, the state agency consultants did not directly contradict the treating physicians. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). The Plaintiff's psychiatrist did find "extreme limitations in activities of daily living," but he never made an evaluation of her RFC. R. at 591-92. The ALJ is permitted to use state agency consultants for this RFC assessment. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005).

The ALJ thoroughly explained her decision regarding the Plaintiff's credibility, and she correctly applied the required legal analysis during this evaluation. Therefore, the ALJ's credibility determination was not patently wrong.

## F. Vocational Expert Testimony

When relying on VE testimony, the ALJ must ensure that the questions posed to the expert incorporate all relevant limitations from which the claimant suffers. *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002). This case varies from the cases cited by the Plaintiff because the ALJ did not ignore the testimony of the VE, nor did she fail to fully inform the VE of all the medical impairments of the Plaintiff. The ALJ properly asked a number of hypothetical questions regarding the Plaintiff's RFC, and the VE noted a number of jobs that could be performed with such limitations. The ALJ properly explained how the Plaintiff could perform work within tight production deadlines while being limited to low stress work while evaluating the Plaintiff's mental RFC. R. at 591-92. The ALJ's questions to the VE were properly articulated and the VE was informed of all the Plaintiff's relevant limitations and work experience. Therefore, the ALJ properly used VE testimony in reaching her decision.

## CONCLUSION

For the reasons set forth above, the Court grants the Plaintiff's Motion for Summary Judgment and denies the Commissioner's Motion for Summary Judgment. The case is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

Dated: July 28, 2011

E N T E R:

*Arlander Keys*
ARLANDER KEYS
United States Magistrate Judge